Entered: January 23rd, 2019
Signed: January 22nd, 2019



THOMAS J. CATLIOTA
U.S. BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| STEIN PROPERTIES, INC., ) | |
| ) | Case No. 17-22680-TJC |
| Debtor. ) | |
| ) | |

## MEMORANDUM OF DECISION

The First National Bank of Pennsylvania (the "Bank") objects to the secured claim of the Columbia Association, Inc. (the "Association"). The parties dispute whether the Association holds a lien against the real property owned by debtor, Stein Properties Inc. (the "Debtor"), for unpaid Association fees and charges. Specifically, the issue is whether the Association obtained a lien with priority over the Bank's deed of trust loan as a result of a declaration it recorded in 1966, or whether it lacks an enforceable lien against the property because it did not comply with the provisions of the Maryland Contract Lien Act, Md. Code Ann., Real Prop. §§ 14-201, *et seq.* (2018) (the "MCLA").

The facts are not in dispute and the parties agree the matter is ripe for resolution. For the reasons stated herein, the court concludes that the Association was required to comply with the MCLA to obtain and enforce a lien for unpaid fees and charges. Because there is no dispute that the Association has not complied with the MCLA, the Association's claim will be disallowed as a secured claim.

1

The court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157(b) and Local Rule 402 of the United States District Court for the District of Maryland. This court has authority to enter a final judgment under 28 U.S.C. § 157(b)(2)(k) and consistent with the standards of *Stern v. Marshall*, 564 U.S. 1058, 132 S.Ct. 56, 180 L.Ed.2d. 924 (2011) and *Wellness Int'l. Network, Ltd. v. Sharif*, 135 U.S. 1932, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015).

**Findings of Fact**

The Debtor filed this Chapter 11 case on September 22, 2017. It obtained confirmation of its second amended plan after a hearing held on September 25, 2018. ECF 147.

*The Debtor's Plan*.

At the time the Debtor filed this case, it owned real property and improvements known as the Columbia Professional Center, located at 10840 Little Patuxent Parkway, Columbia, Maryland (the "Property"). The Debtor filed the case to enable it to conduct an orderly sale of the Property and realize its maximum value. After actively marketing the Property, the Debtor entered into a sale agreement for $5,275,000.00, subject to higher and better offers. The Debtor obtained approval to conduct an auction sale, but no competing offers were made. The court approved the sale for $5,275,000.00.

The sale agreement required the Debtor to obtain confirmation of a plan authorizing the sale. Under the confirmed plan, the sale proceeds will be distributed to the secured creditors in accordance with their lien priorities. Although the Debtor initially hoped the sale would generate sufficient proceeds to pay all secured creditors in full with funds remaining for distribution to the unsecured creditors, that is not the case. Nevertheless, with the agreement of the Bank, the plan provides a carve-out from the funds that would otherwise be paid to the Bank on its secured claim to pay various fees and claims and for distribution to the general unsecured creditors. The

unsecured creditors are expected to receive no more than 5% depending on the resolution of various claim objections.

Other than claims of insiders, the plan contains four classes of potentially secured claims and one class of unsecured claims. The secured claims, and their treatment under the plan, are as follows:

> 3.1 Class 1. Class 1 consists of the Allowed Secured Claims of Howard County, Maryland [of $123,172.93 per Claim #7].
>
> 3.2 Class 2. Class 2 consists of the Allowed Secured Claim of SSC6-MD, LLC [the holder of a tax sale certificate in the amount of $83,921.64 per Claim #5].
>
> 3.3 Class 3. Class 3 consists of the Allowed Secured Claim of the [Association], provided such Claim is allowed as a Secured Claim. If it is determined that [the Association] does not have a valid, fully perfected prepetition lien, Class 3 shall be deemed eliminated as a class under the Plan, the Allowed Claim of [the Association] shall be reclassified as an Allowed Class 6 General Unsecured Claim, and all references in the Plan to Class 3 shall be disregarded.
>
> 3.4 Class 4. Class 4 consists of the Allowed Secured Claims of the [Bank].

ECF 125 at p. 8.

The Bank's Class 4 claims consists of two commercial obligations secured by deeds of trust against the Property. The aggregate balance due to the Bank at the commencement of this case was $5,427,346.52. Claim Nos. 4-1, 6-1. The Association asserts a secured claim of $70,744.48 for unpaid fees and charges accruing over several years.

The approved sale price of $5,275,000 is sufficient to pay the Class 1, 2 and 3 claims but not the Bank's Class 4 claims in full. Accordingly, if the Association's claim in Class 3 is a valid and enforceable secured claim, it will be paid in full. On the other hand, if the claim is found to be unsecured it will share in the distribution to unsecured creditors of 5% or so from the carve-out.

The confirmation of the plan was consensual. In order to provide for an orderly resolution of the dispute over the Association's claim, the parties agreed to escrow the funds that would be otherwise paid to the Association until the dispute is finally resolved. ECF 147 at p. 11. The motion now before the court is the proceeding contemplated by the parties in the confirmation order to resolve the priority and validity of the Association's Class 3 claim. *See* ECF 138, 143, 155 and 157.

*The Association's Claim.*

The Association is a non-profit corporation formed in 1966 to manage the planned community of Columbia, Maryland, in which the Property is located. It provides recreational, cultural and community services to Columbia residents. The Association assesses and collects fees and charges from Columbia property owners, including the Debtor.

The Association assesses fees and charges pursuant to the terms of a Deed, Agreement and Declaration of Covenants, Easements, Charges and Liens dated December 13, 1966, and recorded among the land records of Howard County, Maryland at Liber 463, Page 158 *et seq.* (the "Declaration"). ECF 138-2. There is no dispute that the Property is subject to the Declaration.

The Association asserts its lien claim pursuant to the language in the Declaration. It states:

> [T]he Annual Charge, both prior to and after the assessment thereof in each year, together with the continuing obligation to pay all future Annual Charges assessed in all future years, *shall be and remain a first charge against, and a continuing first lien upon,* . . . the Assessable Property . . . to the end that said charge and lien shall be *superior to any and all other charges, liens or encumbrances which may hereafter in any manner arise or be imposed* upon the Assessable Property . . . *whether arising from or imposed by judgment or decree or by any agreement, contract, mortgage or other instrument*, saving and excepting only such liens for taxes or other public charges as are by applicable law made superior.

4

Declaration at § 3.01 (emphasis added).

There is no dispute that the Association's claims for unpaid fees and charges arose after the Bank's deeds of trust were recorded against the Property and that the Association did not file statements of lien in the land records for Howard County.

## Conclusions of Law

The Association contends that the Declaration unambiguously creates a lien against the Property for unpaid fees and charges and was duly recorded in 1966, long before the Bank's deeds of trust. It contends the lien is enforceable under common law and the Maryland Rules, and that Md. Code Ann., Real Prop. § 11B-117(c)(1)(i) expressly recognizes the priority of the Association's lien. The Bank contends that the Maryland Homeowners Association Act RP §§ 11B-101, *et seq*. (2018) (the "HOA Act") requires the Association to comply with the MCLA to obtain and enforce a lien. The Bank further argues that, even if the HOA Act does not require compliance with the MCLA, the Court of Appeals decision in *Select Portfolio Servicing, Inc. v. Saddlebrook W. Util. Co. LLC ("Select Portfolio Servicing II")*, 167 A.3d 606 (Md. 2017) requires the Association to have complied with the MCLA in order to obtain a lien against the Property for unpaid fees and charges.

The court begins with *Select Portfolio Servicing II*. There, Saddlebrook West, LLC, as the developer of a residential subdivision, created a Declaration of Deferred Water and Sewer Charges (the "Saddlebrook Declaration") to recoup the cost of building the water and sewer infrastructure of the development. The Saddlebrook Declaration, duly recorded in the land records of Prince George's County, ran in favor of a related entity, Saddlebrook West Utility, LLC. ("Saddlebrook"), and imposed an annual water and sewer charge on each identified lot. *Id.* at 609. The Saddlebrook Declaration stated it created a lien against each covered lot, that the

5

lien would have priority over any subsequently recorded instruments, including mortgages, and that the lien could be foreclosed for nonpayment through a power of sale. *Id.*

Saddlebrook brought a foreclosure action against a property on which the homeowner failed to pay the annual charges. Select Portfolio Services, Inc. held a deed of trust loan secured by the property. Select filed a declaratory judgment action claiming its deed of trust to be the first priority lien against the property, that Saddlebrook had no security interest in the property, and that the Saddlebrook Declaration alone did not create an enforceable lien against the property. *Id.* at 612.

The Circuit Court for Prince George's County concluded that the Saddlebrook Declaration was a covenant running with the land that constituted a "valid, enforceable first-priority lien encumbering the Property" and acted as a "super lien in favor of [Saddlebrook]." *Id.* at 614. In adopting this view, the Circuit Court implicitly rejected the argument that the MCLA is the only mechanism for enforcement of the Saddlebrook Declaration.

The Court of Special Appeals affirmed the Circuit Court. *Id.* at 615. It held that the language in the prior-recorded Saddlebrook Declaration was sufficient to create an enforceable lien:

> This language [in the Saddlebrook Declaration] is not ambiguous. . . . [I]t creates a lien against each lot that secures payment of the Water and Sewer Charges for that lot, until they are fully paid.
> *****
> We agree with Saddlebrook . . . that the [Saddlebrook] Declaration created a lien against the Property and that it is a lien instrument. . . . Accordingly, Saddlebrook . . . did not have to invoke the MCLA to create a lien against the Property when Mr. Bradley failed to pay the annual Water and Sewer Charges. The lien already was in existence.

*Select Portfolio Servicing, Inc. v. Saddlebrook W. Util. Co., LLC (Select Portfolio Servicing I)*, 145 A.3d 19, 47-48 (Md. Ct. Spec. App. 2016) (emphasis removed). The Court of Special

Appeals went on to hold:

> The [Saddlebrook] Declaration in this case is a lien created by a contract, as defined by the MCLA. It also is a lien instrument containing a power of sale and assent to a decree that, upon nonpayment of the Water and Sewer Charges by a lot owner, can be foreclosed under the rules governing foreclosure of lien instruments. [Saddlebrook was] not required to obtain a lien under the MCLA, to file a statement of lien, or to enforce [the] lien pursuant to the MCLA. Consequently, the priority of [the] lien was not determined by the recording date of a statement of lien. Instead, it was determined by the recording date of the lien itself, i.e., the [Saddlebrook] Declaration.

*Select Portfolio Servicing I,* 145 A.3d at 50-51.

The Court of Appeals reversed. *Select Portfolio Servicing II,* 167 A.3d 606. It first considered whether Saddlebrook was required to follow the MCLA in order to obtain an enforceable lien under the Saddlebrook Declaration. The Court concluded that the Saddlebrook Declaration did not itself create an enforceable lien and Saddlebrook's failure to comply with the MCLA was fatal to its claim of an enforceable lien.

The Court noted that the MCLA defines "contract" as "a real covenant running with the land . . . ." *Id.* at 615. The contract may be created and enforced if "(1) The contract expressly provides for the creation of a lien; and (2) The contract expressly describes: (i) The party entitled to establish and enforce the lien; and (ii) The property against which the lien may be imposed." RP §§ 14-201(b)(1) and 14-202(a). The MCLA provides specific requirements concerning the notice that must be given to the homeowner before a lien can be established, as well as procedures to allow the homeowner to contest the lien. RP § 14-203(a)-(c). The lien may then be recorded in the land records and enforced via foreclosure. RP §§ 14-203(j) and 14-204(a).

The Court examined the legislative history of the MCLA. Enacted in 1985, the MCLA was established as a direct result, and in response to, the 1985 Court of Special Appeals unreported opinion in *Surfside 84 Condominium Council of Unit Owners v. Mullen*, No. 495,

7

Sept. Term 1984 (Md. Ct. Spec. App. Jan. 28, 1985). The purpose of the MCLA was to "establish procedural rules that comported with due process for establishing, enforcing, or denying a lien based on a contract." *Select Portfolio Servicing II*, 167 A.3d at 617 (referring to Report of Senate Judicial Proceedings Committee concerning Senate Bill 625 (Mar. 20, 1985)).

According to the Court, Saddlebrook's contention that the Saddlebrook Declaration itself created an enforceable lien was contrary to the legislative history and purpose of the MCLA – "to provide procedures that comported with constitution requirement of procedural due process." *Id.* at 619. The Court recognized that the Saddlebrook Declaration stated it established a lien on each lot with priority dating from the date it was recorded. But, as the Court stated, "just because a document says something is so does not make it so." *Id*. at 617. Accordingly, the Court concluded that Saddlebrook was required to comply with the MCLA to obtain an enforceable lien.

The Court then rejected Saddlebrook's arguments that it obtained a lien under the common law, the Maryland Rules or "the coattails of the Washington Suburban Sanitary Commission".[1] *Id.*

As applicable to this case, *Select Portfolio Servicing II* must be read in conjunction with the HOA Act. Section 11B-117(a) and (b) provides:

> **In general**.
> (a) As provided in the declaration, a lot owner shall be liable for all homeowners association assessments and charges that come due during the time that the lot owner owns the lot.
>
> **Enforcement of payments**
> (b) In addition to any other remedies available at law, a homeowners association may enforce the payment of the assessments and charges provided in the

---

[1] Saddlebrook entered into an agreement with the WSSC to be responsible for the water and sewer construction for the subdivision at issue and as a result, Saddlebrook would then recoup the expense from the homeowners via the Declaration.

8

>declaration by the imposition of a lien on a lot in accordance with the Maryland Contract Lien Act.

RP § 11B-117(a), (b). Pursuant to RP § 11B-117(b), if a homeowners association seeks to enforce fees and charges through the lien provided in a declaration, it must do so in accordance with the MCLA. Accordingly, for the Association to impose and enforce the lien provided in the Declaration, it was required to comply with the MCLA. There is no dispute it did not do so.

The Association points to the introductory language in section (b) stating "[i]n addition to any other remedies available at law . . . ." *Id*. It argues this means the Association could obtain and enforce a lien under the Declaration through means other than following the MCLA. The court disagrees.

Initially, the court rejects the Association's argument as a matter of statutory construction. The primary clause of subsection RP § 11B-117(b) applies where an association seeks to enforce the payment of assessments and charges by "the imposition of a lien" in a declaration. In that situation, an association must comply with the MCLA. An association may also seek to enforce the payment of the assessments and charges by other remedies available at law, such as bringing suit and reducing the claim to judgment. In that event, however, an association is not seeking to enforce payment by "the imposition of a lien" in a declaration. Thus, the phrase "other remedies available at law" applies where an association is seeking to enforce payment of charges through a means other than the imposition of the lien in a declaration. Where, as here, an association is seeking to enforce payment by the imposition of a lien in a declaration, it must comply with the MCLA.

More to the point, however, the direct answer to the Association's argument is that *Select Portfolio Servicing II* establishes that enforcement of a lien provided in a declaration without compliance with the MCLA is not a remedy available at law. The HOA Act did not apply in

9

*Select Portfolio Servicing II*. The Court specifically addressed what remedies were available under the Saddlebrook Declaration outside of the HOA Act, *i.e.,* what remedies were available at law. The Court made it clear that the lien provided in a recorded declaration must be imposed and enforced under the MCLA. Therefore, the imposition and enforcement of a lien provided in a declaration without compliance with the MCLA is not one of the "other remedies available at law" allowed by RP § 11B-117(b).

Next, the Association relies on RP § 11B-117(c)(1)(i) of the HOA Act to support its position that RP § 11B-117(b) does not limit its lien enforcement rights to the MCLA. That subsection states:

> (c)(1) This subsection does not limit or affect the priority of:
> (i) A lien for the annual charge provided first priority over a deed of trust or mortgage by the deed, agreement, and declaration of covenants, easements, charges, and liens dated December 13, 1966, and recorded in the land records of Howard County (the Columbia Association Declaration);

RP § 11B-117(c)(1)(i).[2]

---

[2] Subsection (c) of RP § 11B-117 reads in its entirety:
  (c)(1) This subsection does not limit or affect the priority of:
   (i) A lien for the annual charge provided first priority over a deed of trust or mortgage by the deed, agreement, and declaration of covenants, easements, charges, and liens dated December 13, 1966, and recorded in the land records of Howard County (the Columbia Association Declaration);
   (ii) Any lien, secured interest, or other encumbrance with priority that is held by or for the benefit of, purchased by, assigned to, or securing any indebtedness to:
    1. The State or any county or municipal corporation in the State;
    2. Any unit of State government or the government of any county or municipal corporation in the State; or
    3. An instrumentality of the State or any county or municipal corporation in the State.
  (2) In the case of a foreclosure of a mortgage or deed of trust on a lot in a homeowners association, a portion of the homeowners association's liens on the lot, as prescribed in paragraph (3) of this subsection, shall have priority over a claim of the holder of a first mortgage or a first deed of trust that is recorded against the lot on or after October 1, 2011.
  (3) The portion of the homeowners association's liens that has priority under paragraph (2) of this subsection:
   (i) Shall consist solely of not more than 4 months, or the equivalent of 4 months, of unpaid regular assessments for common expenses that are levied by the homeowners association in accordance with the requirements of the declaration or bylaws of the homeowners association;

The Association contends that the Declaration is "the deed, agreement, and declaration of covenants, easements, charges, and liens dated December 13, 1966, and recorded in the land records of Howard County (the Columbia Association Declaration)" described in RP § 11B-117(c)(1)(i).  For purposes of this motion, the Bank does not dispute this assertion.  The Association contends that subsection (c)(1)(i) "specifically recognizes and preserves the first priority lien" under the Declaration and "could not be more clear" in recognizing and preserving that lien.  ECF 143, ¶¶ 9-10.  Again, the court disagrees.

The Association's position fails to account for several aspects of the statute.  Section 11B-117(c)(1) is applicable only to subsection (c), as evident by the language *"[t]his subsection does not limit . . . ."* (emphasis added).  The requirement that a homeowners association must follow the MCLA to enforce the lien provided in a declaration is established under subsection (b) of RP § 11B-117.  By its terms then, subsection (c) does not limit or modify the requirements of subsection (b).

---

    (ii) May not include:
     1. Interest;
     2. Costs of collection;
     3. Late charges;
     4. Fines;
     5. Attorney's fees;
     6. Special assessments; or
     7. Any other costs or sums due under the declaration or bylaws of the homeowners association or as provided under any contract, law, or court order; and
    (iii) May not exceed a maximum of $1,200.
(4) (i) Subject to subparagraph (ii) of this paragraph, at the request of the holder of a first mortgage or first deed of trust on a lot in a homeowners association, the governing body shall provide to the holder written information about the portion of any lien filed under the Maryland Contract Lien Act that has priority as prescribed under paragraph (3) of this subsection, including information that is sufficient to allow the holder to determine the basis for the portion of the lien that has priority.
    (ii) At the time of making a request under subparagraph (i) of this paragraph, the holder shall provide the governing body of the homeowners association with the written contact information of the holder.
    (iii) If the governing body of the homeowners association fails to provide written information to the holder under subparagraph (i) of this paragraph within 30 days after the filing of the statement of lien among the land records of each county in which the homeowners association is located, the portion of the homeowners association's liens does not have priority as prescribed under paragraph (2) of this subsection.

Similarly, subsection (c)(1) states that subsection (c) "does not limit or affect the priority of . . . [the] lien" provided in the Declaration. But the "priority of [the] lien" is established by application of RP § 11B-117(b) and *Select Portfolio Servicing II,* requiring compliance with the MCLA. In the absence of complying with the MCLA, the lien provided in the Declaration is not valid or enforceable. Therefore, the limitations contained in subsection (c) do not apply. To put it otherwise, it is the Association's failure to comply with the MCLA, not the provisions of subsection (c), that limits the priority of the lien provided in the Declaration.

The precise meaning of subsection (c)(1)(i) as it applies to the Declaration must await a case where the Association complies with the MCLA and has a dispute with a mortgagee over foreclosure proceeds. It may be that in such a case, the limitations on a homeowners association's recovery contained in subsection (c)(3) do not apply to the Association. But that question is not before the court. It is sufficient to determine here that subsection (c)(1)(i) does not override the requirements of RP § 11B-117(b) and *Select Portfolio Servicing II*—that a homeowners association must comply with the MCLA to enforce the lien provided in the declaration.

The Association next argues that a determination that it lacks a valid and enforceable lien because it did not comply with the MCLA would destroy its rights established in the Declaration, which was recorded before the MCLA was adopted. The Association argues that destruction of its pre-existing lien rights would violate the United States Constitution's Contract Clause, which states that "[n]o State shall . . . pass any . . . law impairing the obligation of contracts[.]" U.S. Const., Art. 1, § 10. ECF 143 at n. 3. But this argument would have merit, if at all, only if the Association obtained a valid and enforceable lien under the Declaration that was negated by the statute. *Select Portfolio Servicing II* establishes that a recorded declaration that asserts lien rights

12

"[does] not itself create a lien on the property." 167 A.3d at 607. Since the Declaration did not create a valid lien, the MCLA, which establishes how a lien can be created and enforced, did not destroy the rights of the Association under the Declaration. To the contrary, the MCLA enhances the Association's rights under the Declaration by establishing a process to give effect to those rights. Thus, the Association's lien was not impaired by the MCLA, because the Association did not hold a valid and enforceable lien prior to the enactment of the MCLA.

In sum, in *Select Portfolio Servicing I,* the Court of Special Appeals determined that the language in the Saddlebrook Declaration unambiguously created a lien that could be enforced through the power of sale provision under the rules governing foreclosure of lien instruments. It held that priority of the lien was determined by the date of recording the Saddlebrook Declaration, and that compliance with the MCLA was not required. *Select Portfolio Servicing I* 145 A.3d at 50-51. This is precisely the position asserted by the Association here: The unambiguous language in the Declaration creates a lien containing a power of sale that can be foreclosed upon and it is not required to enforce the lien under the MCLA. The Court of Appeals flatly rejected this position, finding Saddlebrook's argument contrary to the legislative history and purpose of the MCLA— "to provide procedures that comported with constitutional requirement[s] of procedural due process." *Select Portfolio Servicing II,* 167 A.3d at 619 (citing *Golden Sands Club Condo., Inc. v. Waller,* 545 A.3d 1332, 1337 (Md. 1988)). The rationale of *Select Portfolio Servicing II* is even more compelling here because of the applicability of RP § 11B-117(b) of the HOA Act.

## Conclusion

For the foregoing reasons, the Association's claim will be disallowed as a secured claim and allowed as an unsecured claim. A separate order will follow.

cc:

| | |
|---|---|
| David H. Bamberger | david.bamberger@dlapiper.com |
| Edward S. Scheideman | edward.scheideman@dlapiper.com |
| C. Kevin Kobbe | kevin.kobbe@dlapiper.com |
| Lawrence A. Katz | lkatz@hirschlerlaw.com |
| Scott R. Robinson | scottr@hbllaw.com |

Jeanne M. Crouse
Office of the U.S. Trustee
6305 Ivy Lane, Ste. 600
Greenbelt, MD 20770

**END OF MEMORANDUM OF DECISION**